FILED
UNITED STATES DISTRICT COURT IN CLERKS OFFICE
DISTRICT OF MASSACHUSETTS

2005 FEB -3 P 2: 57
DOCKET NO. 04-121412GAO

U.S. DISTRICT COURT
DISTRICT OF MASS.

```
**************************************
LISA A. LEGER,                          *
        Plaintiff                       *
                                        *
v.                                      *
                                        *
MARK J. LEGER, individually and as      *
TRUSTEE OF MAD/NAT REALTY               *
TRUST and MAT/NAT II REALTY             *
TRUST,  LEO LEGER, and ELLA LEGER,      *
        Defendants                      *
**************************************
```

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS, LEO AND ELLA LEGER'S MOTION FOR ORDER REMOVING MARK LEGER AND LISA LEGER FROM THEIR RESPECTIVE POSITIONS AS TRUSTEE AND BOOKKEEPER OF THE MAD/NAT I AND II REALTY TRUSTS AND APPOINTING LEO AND ELLA LEGER AS SUCCESSOR TRUSTEES

### FACTS

Mark Leger and Lisa Leger were married on November 21, 1993.  Mark Leger

(hereinafter "Mark") filed for divorce on January 29, 2003 in the Middlesex Probate & Family

Court, which matter is pending (hereinafter the "Divorce Action").

Mark is a real estate broker and, since 1987, has owned and operated a real estate firm

called Kelmark Associates with his wife Lisa Leger (hereinafter "Lisa").  Mark has solely operate

the firm since the birth of Mark and Lisa's second child in 1998.  Mark derives income from

assisting clients to buy, sell and rent properties.

Since 1987, Mark and Lisa have also operated a real estate business that derives income

from apartment buildings and rooming houses in Waltham, Massachusetts.  Mark and Lisa

currently own six Waltham properties from which they derive rental income:

| | | |
|---|---|---|
| a. | 109-111 Cushing Street | Apartment building (4 units) |
| b. | 89-93 Francis Street | Apartment building (4 units) |
| c. | 17 Robbins Street | Apartment building (6 units) |
| d. | 19 Robbins Street | Apartment building (6 units) |
| e. | 10 Maple Street | Rooming house (11 units) |
| f. | 240 Crescent Street | Rooming house (12 units) |

Additionally, Mark owns part of 796 Moody Street, Waltham, Massachusetts, which houses the office for Kelmark Associates. Mark does not pay rent for the office space at 796 Moody Street. Mark Leger is the Trustee of Mad/Nat Realty Trust and Mad/Nat II Realty Trust (hereinafter the "Trusts"). The beneficiaries are Mark Leger, Lisa Leger, Ella Leger and Leo Leger, all of whom have an equal beneficial interest in the Trust.

Mark Leger, as Trustee, holds title to the Properties (except 240 Crescent Street). Mark is also Trustee of Pantu Realty Trust, which holds title to 240 Crescent Street. All above stated parties are beneficiaries of Pantu Realty Trust.

Mark and Lisa also own a single family residence, title to which is not in trust - 20 Dexter Street, Waltham, Massachusetts, where Lisa lives with the parties two children, ages 8 and 6.

Since 1987, Lisa has served as the rental agent for the Properties. As rental agent, her duties include advertising vacancies, placing qualified tenants in apartments, and bookkeeping. Mark handled other aspects of the management, including emergency repairs and problemes. Since 1987, Mark and Lisa have managed the Properties approximately 75% of the time, with Leo and Ella Leger (hereinafter "Leo" and "Ella" respectively) helping to manage the Properties approximately 40 hours per month.

2

The Properties should generate a monthly income of approximately \$30,000. However, since the filing of divorce, Mark has failed to deliver any rents from Crescent Street to Lisa. Without the rents from Crescent Street, the rents from the other Properties (a through e) should generate monthly income in the amount of \$24,099.

The monthly expenses of the Properties and other business expenses total approximately \$26,650, which figure includes the monthly increase of \$3,000 added to the mortgage payments to pay the water bill arrearage. The expenses include mortgages (including payment on a promissory note to Leo and Ella), insurance, oil, electricity, gas, hot water, water, sewer, supplies, plumbing, minor repairs and Mark and Lisa's car insurance.

Since Mark filed for divorce, Mark and Lisa have been unable to communicate regarding the management of the Properties. Upon his filing for divorce, Mark only began delivering an average of approximately \$19,000 per month from the rental income to Lisa, which was drastically short of the amount necessary to pay the monthly expenses. After an evidentiary hearing, the Probate Court entered an Order on June 8, 2004 (the "Probate Order") setting forth in detail Mark's and Lisa's responsibilities regarding the Properties. Mark is responsible for collecting all the rents from all the Properties (a through f) and delivering the rents to Lisa, from which she is to pay the monthly expenses, including her expenses for 20 Dexter Street.

Mark has not abided by the Probate Order. Mark has failed to provide all cash payments and money order payments, to fill vacancies in a timely manner, failed to advertise vacancies, failed to timely advise Lisa of vacancies, failed to make minor necessary repairs, including failure to repair water leaks, failed to timely evict tenants, failed to timely collect rent, failed to deliver keys to vacant units to Lisa, and failed to timely deliver all collected rents to Lisa so that

3

she may pay the expenses.

Subsequent to the Divorce Action, Mark hired a woman to assist in collecting the rents, a responsibility he is to bear pursuant to the Probate Order. The salary paid to this employee is detracting from the available money to pay expenses.

Mark has allowed the office at Kelmark Associates to become run down and he is rarely present at the office to assist prospective clients. Although Lisa has been placing advertisements to rent vacant units, Mark has hindered her responsibility by changing the locks and failing to provide new keys to Lisa, nor has he allowed Lisa access to Kelmark Associates to rent properties.

Mark has failed to deliver any rents from Crescent Street to Lisa, although that is his obligation pursuant to the Probate Order. Crescent Street is a rooming house which derives approximately $80,000 per year in gross income.

The overdue water bills were only added to the mortgage payments **after** Mark had been ordered to pay the outstanding water bills, pursuant to the Probate Order. His failure to do so led the bank to escrow the arrears, thereby increasing the monthly mortgage payments. There are currently 2 major water leaks which have become large bills.

In July 2004, the Probate Court judge ordered Mark and Lisa to refinance Francis Street and Cushing Street in order to pay off existing debt of the Properties, as well as personal debt. There is at least $500,000 in equity in both properties. Prior to the court order, Mark agreed to refinance several times. Only after Lisa contacted a mortgage broker to begin the process, did Mark inform Lisa that his mother, Ella, would not agree to refinance. Additionally, Mark's credit rating (which had been stellar prior to the divorce) did not allow Lisa to refinance.

4

Mark did not inform Lisa that the porch at the Francis Street property collapsed until after he had hired someone to repair it. At that time (and currently), $2,600 was not available to pay for the repair, as there was not enough money to pay the regular monthly expenses. Upon information and belief, a building permit was not obtained prior to the repair.

When Mark informed Lisa that the Robbins Street roof needed repairs, it was the first time Lisa was made aware of any leaks, as Mark claimed the roof had been repaired the previous year. Although, there was no available money to pay for a repair, Mark unilaterally hired someone to repair the roof. Upon information and belief, a building permit was not obtained prior to the repair.

When Mark informed Lisa that the fire detection system at the Maple Street property needed to be replaced at an estimated $3,800, Lisa informed him that there was not enough money from the collected rents to pay for this repair. Additionally, *they had just had the system replaced and brought up to code the prior year*. When Mark deducted (again, in violation of the Probate Order) $1,000 from the rents to pay for this repair, Lisa was unable to pay all the bills that month, as that $1,000 was needed to pay the bills.

Regarding paragraph 11 of the Affidavit of Ella Leger, Mark never informed Lisa that the boiler needed to be replaced. Instead, Mark told Lisa that the increase in rent was just that - an increase in the rent. In 2003, Mark gave his brother, Thomas Leger, a boiler and Thomas was supposed to have replaced it with a new boiler for Robbins Street. Ella's Affidavit was the *first* Lisa have heard of the broken boiler at Robbins Street.

5

ARGUMENT

Since the divorce, Mark has deliberately mismanaged the Properties in, upon information and belief, an effort to involve his parents, Leo and Ella, in his attempt to leave Lisa with no interest in the Properties upon a divorce.

Leo and Ella's claims regarding Lisa in their Motion are not due to actual knowledge, but rather, the statements of Mark and/or his attorney in the Divorce Action. Leo and Ella are not parties to the Divorce Action, have not been present at any of the hearings in the Divorce Action (almost all of which regard the payment of expenses of the Properties) and, therefore, are probably unaware that the judge in the Divorce Action has decided in Lisa's favor in almost every motion, whether it was brought by Lisa or by Mark. In fact, the judge assessed $20,000 in attorney's fees against Mark due to his litigious behavior in the Divorce Action.

For instance, Mark has not delivered checks to Lisa every 7 days, as is specified in the Probate Order. Without timely receipt of all of the rental income, Lisa cannot pay the bills on time, which fact has been heard by the court in the Divorce Action several times. Mark has not delivered keys to Lisa within 7 days of any vacancy, as is specified in the Probate Order. Without the timely receipt of keys to vacant apartments, Lisa cannot rent the apartments, as she cannot show the apartments to prospective tenants. As Mark is responsible for collecting the rents, he is the one with actual knowledge as to which tenants are in arrears. Yet, Mark has failed to properly evict tenants who have not paid and failed to institute any informal collection procedures for tenants who pay late.

The only money available to pay the expenses of the Properties is the rental income collected by Mark. If said rental income delivered by Mark to Lisa is not sufficient to pay the

6

monthly expenses, it is through no fault of Lisa's. Lisa's "refusal" to pay for repairs has been
grossly misstated by Leo and Ella in their motion. In fact, as there has not been sufficient funds
delivered by Mark to pay the regular monthly bills, there are certainly no excess funds with
which to pay repairs. Very soon after Lisa had filed a complaint for contempt in the Divorce
Action due to Mark's failure to pay child support and the outstanding water bills, the Properties
were suddenly in need of major repairs.

Leo and Ella are claiming that the following repairs/expenses were necessary and the cost
of the repairs/expenses were as follows:

| | | |
|---|---|---|
| 1. | Accountant fees | $900.00 |
| 2. | Collapsed porch | $2,600.00 |
| 3. | Roof- Robbins Street | $7,200.00 |
| 4. | Fire detection system | $3,800.00 |
| | | $14,500.00 |

Leo and Ella's instant Motion is apparently based on their proposition that Lisa should
have paid for the $14,500 in repairs. Yet, as has been claimed and demonstrated at an
evidentiary hearing in March 2004 in the Divorce Action, Mark has failed to properly deliver all
the rents to Lisa to pay bills and make repairs. Lisa has no outside income and 2 children to
support. The fact that Leo and Ella have claimed that Lisa was derelict in failing to come up with
$14,500 to pay for repairs only lends credence to the claim that they have a demonstrated
animosity towards Lisa due to the divorce from their son and are using their leverage as
beneficiaries under the realty trusts to assist Mark in his claims.

Lisa is caught in the impossible position of being responsible for paying bills while her
soon to be ex-husband has complete control over the delivery of money to pay those bills. Leo

and Ella's claims regarding Lisa's actions or inactions are tainted due to the divorce action. Leo and Ella's interest in Mark and Lisa's divorce is evident by their Memorandum in support of their Motion, wherein they stated Lisa "kicked Mark out of the house." As the instant case is not about the divorce but, rather, the title to real estate, it is none of Leo and Ella's concern as to the reasons for the divorce, and such statements demonstrate their allegiance with their son, Mark.

Leo and Ella's involvement in the emotional process of their son's divorce is reason why they cannot be impartial as Trustees of the trusts or as bookkeepers of the real estate records. (See Shear v. Gabovitch, 685 N.E.2d 1168, 43 Mass.App.Ct. 650 (1997), where court found that the removal of a trustee was warranted where there was hostility between the trustees and the beneficiaries, which threatened to interfere with the administration of the trust.) By their actions, Leo and Ella have exhibited hostility towards Lisa. The reason Lisa filed the present complaint in equity was due to Mark, Leo and Ella's legal claims regarding Lisa's interest in the real estate. If Leo and Ella are now appointed trustees and/or bookkeepers, they will have complete control over marital assets which are the subject of much controversy in the Divorce Action, and, due to their allegiance to their son, may interfere with the proper administration of the trust to the detriment of Lisa.

### CONCLUSION

Lisa agrees that control over the properties and the bookkeeping should be given to a third party due to the contentious nature of the divorce and the inability of Mark and Lisa to agree on the management of the properties. However, such control should not be given to Leo and Ella, as they are not neutral parties, they have an interest in seeing that their son receives a

8

greater portion of the marital assets (which includes the Properties) and they have a demonstrated animosity towards Lisa. Although there would be an expense in hiring a third party to manage the property, the employment of such a neutral party would end much of the disagreement and accusations regarding the receipt of rents and the payments of bills and repairs.

Respectfully submitted,
LISA A. LEGER
By her attorneys,

Andra Curtis Hutchins
BBO# 630066
Kerstein, Coren, Lichtenstein & Finkel, LLP
60 Walnut Street, 4th Floor
Wellesley, MA 02481
617-965-9698

DATED: February 3, 2005

## CERTIFICATE OF SERVICE

I, Andra Curtis Hutchins, hereby certify that a true copy of the above document was served upon all counsel of record, Matthew J. Dupuy, Esq., Ardito, Sweeney, Stusse, Robertson & Dupuy, P.C., 25 Mid-Tech Drive, West Yarmouth, MA 02673 and Francis Jenney, Esq., Harnish, Jenney, Mitchell & Resh, 564 Main Street, Waltham, MA 02452 by mail this 3 day of February, 2005.

Andra Curtis Hutchins