UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DOCKET NO. 04-121412GAO

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| LISA A. LEGER, | * |
|     Plaintiff | * |
| | * |
| v. | * |
| | * |
| MARK J. LEGER, individually and as | * |
| TRUSTEE OF MAD/NAT REALTY | * |
| TRUST and MAT/NAT II REALTY | * |
| TRUST, LEO LEGER, and ELLA LEGER, | * |
|     Defendants | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## AFFIDAVIT OF LISA A. LEGER

1. Mark Leger and I were married on November 21, 1993. Mark filed for divorce on January 29, 2003.

2. Mark is a real estate broker and, in 1987, we opened and operated a full service real estate firm called Kelmark Associates. Mark has solely operated the firm since the birth of our second child in 1998. Mark derives income from assisting clients to buy, sell and rent properties, and manages 7 real estate rental/sales agents.

3. Also since 1987, Mark and I operated a real estate business that derives income from apartment buildings and rooming houses in Waltham, Massachusetts.

4. We currently own six Waltham properties from which we derive rental income (hereinafter the "Properties"):

    | | | |
    |---|---|---|
    | a. | 109-111 Cushing Street | Apartment building (4 units) |
    | b. | 89-93 Francis Street | Apartment building (4 units) |
    | c. | 17 Robbins Street | Apartment building (6 units) |
    | d. | 19 Robbins Street | Apartment building (6 units) |
    | e. | 10 Maple Street | Rooming house (11 units) |
    | f. | 240 Crescent Street | Rooming house (12 units) |

5. Additionally, Mark owns part of 796 Moody Street, Waltham, Massachusetts, which is the office for Kelmark Associates. Mark does not pay rent for the office space at 796 Moody Street.

6.  Mark and I also own a single family residence, 20 Dexter Street, Waltham, Massachusetts, where I live with our 2 children, ages 8 and 6.

7.  Since 1987, I have served as the rental agent for the Properties. My duties include advertising vacancies, placing qualified tenants in apartments and bookkeeping.

8.  Since 1987, Mark and I managed the Properties approximately 75% of the time, with Leo and Ella being around approximately 40 hours per month to help manage. I rented the Properties and managed all aspects of the bookkeeping, including collection of rents. Mark handled other aspects of the management, including emergency repairs and problems.

9.  The Properties should generate monthly income of approximately $30,000. However, Mark has failed to deliver any rents from Crescent Street to me. Without the rents from Crescent Street, the rents from the other properties (a through c) should generate monthly income in the amount of $24,099.

10. The monthly expenses of the Properties and other business expenses total approximately $26,650 (this figure includes the monthly increase of $3,000 added to the mortgage payments to pay the water bill arrearage. Please see paragraph 14). The expenses include mortgages, insurance, oil, electricity, gas, hot water, water, sewer, supplies, plumbing, minor repairs, Mark and Lisa's car insurance.

11. Since Mark filed for divorce 2 years ago, we have been unable to communicate regarding the management of the Properties and Mark was only delivering an average of approximately $19,000 per month from the rental income, which was not enough to pay the monthly expenses.

12. After an evidentiary hearing in March 2004, the Probate Court (Dilday, J.) entered an Order on June 8, 2004 (the "Probate Order") setting forth in detail Mark's and my responsibilities regarding the Properties. Basically, all the expenses of the Properties and Dexter Street are to paid from the rents delivered by Mark to me.

13. Mark has not abided by the Probate Order. Since the filing of the divorce, Mark has failed to provide all cash payments and money order payments, failed to fill vacancies in a timely manner, failed to advertise vacancies, failed to timely or truthfully advise me of vacancies, failed to make minor necessary repairs, including failure to repair water leaks, failed to timely evict tenants, failed to timely collect rent, failed to deliver keys to vacant units, and failed to timely deliver all collected rents to me (all of which are his responsibilities pursuant to the Probate Order) so that I may pay the expenses.

14. In fact, after he filed for divorce, Mark immediately hired a woman to help collect the rents, which he is under court order to do himself. The salary paid to this woman is detracting from the available money to pay expenses.

15. Nobody is ever at Kelmark Associates to help prospective clients. I can see the office from my house on Dexter Street, and it looks run down, is not cared for, and Mark is rarely there.

16. I have been placing advertisements to rent vacant units (which is my responsibility pursuant to the Probate Order), but Mark has made it impossible for me to fill the units, as he has changed the locks and not given the keys to me, and has not allowed me access to Kelmark Associates to sell or rent properties.

17. Mark has failed to deliver any rents from Crescent Street to me, although that is his obligation pursuant to the Probate Order. Crescent Street is a rooming house which derives approximately $80,000 per year in gross income. As such, I have been forced to deduct $600 per month from mortgage payments to Ella Leger (the amount Ella used to pay me for profits from Crescent Street until November 2003), which has paid for insurance bills for the Properties.

18. Since the divorce was filed, Mark has mismanaged the Properties. There are currently 5 or more vacancies which have not yet been rented. Also, Mark has failed to make minor repairs to the Properties. The Waltham Housing Authority has threatened to terminate our leases if these repairs are not made and is withholding rents on 2 units. Upon information and belief, according to a report from an inspection performed by the Waltham Housing Authority, there is no black mold damage caused by any roof leak as claimed in the Affidavit of Ella Leger.

19. The overdue water bills were only added to the mortgage payments **after** Mark had been ordered to pay the outstanding water bills, pursuant to the Probate Order. His failure to pay the water bills led the bank to escrow the arrears, thereby increasing the monthly mortgage payments by $3,000. Additionally, the monthly water expenses used to be $1,000. The expenses now greatly exceed that amount due to Mark's continued failure to repair water leaks. There are currently 2 major water leaks which have become huge bills.

20. Mark is living rent free in one of the apartments on Francis Street, which detracts from the rent we should receive from that apartment. Mark's brother (Leo and Ella's son), Charles Leger, also lives rent free in one of the apartments on Maple Street, without my consent, which detracts from the rent we should receive from that apartment.

21. The only money available to pay the expenses of the Properties is the rental income collected by Mark. There has not been sufficient funds delivered by Mark to even pay the regular monthly bills and I have been unable to stay current with all the bills. After the payment of monthly bills, there are no excess funds with which to pay for major repairs.

22. In July 2004, the Probate Court judge ordered Mark and I to refinance Francis Street and Cushing Street because we were in dire need of funds to pay off existing debt and there is at least $500,000 worth of equity in Francis and Cushing. Prior to the court order, Mark

agreed to refinance several times. I took steps and contacted a mortgage broker to begin the process of refinancing. I was then informed that Mark's mother, Ella, would not allow us to refinance and Mark had ruined his credit (prior to that, he had a top credit rating). The financial situation has become as drastic as it is because we have been prevented from refinancing by Leo and Ella (who agreed to refinance last year). The monies from the refinancing could have been used to pay for repairs.

23. Mark did not inform me that the porch collapsed until *after* he hired someone to fix it. I informed him that there was not an extra $2,600 out of the collected rents to pay for this repair. As it was, there was not enough money to even pay the mortgages and all the monthly bills, including suppliers.

24. When Mark informed me that the Robbins Street roof needed repairs, I informed him that there was not an extra $7,200 out of the collected rents to pay for this repair. He had not informed me of leaks prior to this. In fact, he went ahead and repaired the roof anyway, even though his unilateral action was a violation of the Probate Order.

25. When Mark informed me that the fire detection system at the Maple Street property needed to be replaced at an estimated $3,800, I informed him that there was not enough money from the collected rents to pay for this repair. Additionally, *we had just had the system replaced and brought up to code the prior year*. When Mark deducted (again, in violation of the Probate Order) $1,000 from the rents to pay for this repair, I was unable to pay all the bills that month, as that $1,000 was needed to pay the bills.

26. Regarding paragraph 11 of the Affidavit of Ella Leger, Mark never informed me that the boiler needed to be replaced. He told me that the increase in rent was just that - an increase in the rent. In 2003, Mark gave his brother, Thomas Leger, a boiler and Thomas was supposed to have replaced it with a new boiler for Robbins Street. Ella's Affidavit was the *first* I have heard of the broken boiler at Robbins Street.

27. I have not refused to pay for repairs. I have been in the real estate business for almost 20 years and I understand how to manage rental properties. There simply is not enough rent money delivered by Mark to pay for repairs, as well as the monthly bills.

28. After Mark filed for divorce, he claimed that he used $54,000 of rental income to pay for capital repairs, including the replacement of roof, porches and decks. He has never provided receipts for these repairs and, suddenly, he is claiming these repairs must be made again.

29. Upon information and belief, *no building permits were ever pulled* when Mark unilaterally authorized the repair to the collapsed porch and the roof. I was never allowed the opportunity to obtain additional estimates.

30. I have no outside income and 2 children to support. I am responsible for paying bills for the Properties while my soon to be ex-husband has complete control over the delivery of

money to pay those bills.

31. Prior to the divorce, I managed to pay all the bills, suppliers and repairs of the Properties without problem, as there was always enough money from the collected rents to do so. The money problems only surfaced when Mark filed for divorce and his parents became involved.

32. Since Mark filed for divorce, Ella has exhibited hostility toward me in statements and actions. We had a great relationship prior to my husband filing for divorce. Now, she will not even speak to me.

Signed under the pains and penalties of perjury this 3rd day of February, 2005.

_____
Lisa A. Leger